Hand-Delivered

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| BILL MADSON, individually and as next friend of CHILD, a minor,<br><br>      Plaintiffs,<br><br>v.<br><br>HCA HEALTHCARE, INC. and<br><br>MH MISSION HOSPITAL, LLLP and<br><br>MH MASTER HOLDINGS, LLP, and<br><br>MH HOSPITAL MANAGER, LLC, and<br><br>MELINA ARROWOOD, and<br><br>WARREN DEPONTI, and<br><br>MATTHEW EDWARDS, and<br><br>JANE DOES 1-25, and<br><br>JOHN DOES 1-25.<br><br>      Defendants | Case # 1:25CV455-MOC-WCM<br><br><br>AMENDED COMPLAINT<br><br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1. Plaintiff Bill Madson brings this action before the court on a pro se basis, on behalf of himself and his minor child CHILD, alleging as follows:

2. This case arises from the treatment and discharge of CHILD, an autistic child who remained an admitted psychiatric patient while being discharged from care in a public hospital lobby without privacy, safety planning, or teach-back, following days of documented advocacy by

her father regarding patient safety, hygiene, staffing, and the treatment of vulnerable children in the Mission system.

3. CHILD's discharge was not a routine clinical event. It occurred in a manner materially different from accepted psychiatric discharge practices, from CHILD's own prior discharge experience at the same facility six months prior, and from what Defendants themselves documented as clinically necessary only days earlier. At the moment CHILD was escorted from the unit into the public lobby, CHILD remained an admitted patient and had unrestricted physical access to exit the hospital before the discharge process was completed.

4. Immediately preceding the discharge, a senior hospital executive personally inserted herself into CHILD's care pathway by contacting CHILD's father while representing herself as a nurse, admonishing him for recording a call concerning his child not receiving three (or possibly four) medication doses, and discouraging further inquiry. The following morning, CHILD was discharged in a three-to-four-minute meeting in the Sweeten Creek lobby, with all parties in standing position, with a stranger present the entire time who could hear every word, with no case manager or therapist present, with no presence of the two licensed physicians who signed off on the discharge paperwork, without a completed safety plan, and without teach-back - all of this took place at modern acute stabilization psychiatric facility and despite the child having diagnoses of suicidality and autism.

5. After the discharge, CHILD's medical record and billing documentation reflected events that did not occur. Records indicate that teach-back was performed when it was not, that a safety plan was assessed when it was not, and that a discharge lasting more than thirty minutes occurred when it did not. Defendants later acknowledged in writing that CHILD's protected health information was disclosed to unauthorized third parties during the discharge process.

6. Throughout CHILD's hospitalization, the father's advocacy was repeatedly documented by staff, escalated internally, and later characterized as agitation, dishonesty, or unreasonably disruptive. Issues he raised—such as the failure to offer showers to psychiatric minors, understaffing in the pediatric psychiatric pod, and the inability of staff to locate a hospitalized child on August 23—were either omitted from internal summaries or contradicted by post-hoc institutional conclusions.

7. These events did not occur in isolation. They arose during a period of heightened regulatory scrutiny, involved multiple internal investigations conducted after advocacy was raised, and culminated in actions that plausibly served corporate convenience rather than patient safety – and the patient was an autistic minor at one of the most vulnerable times in her life. The sequence of events—advocacy, executive intervention, abnormal discharge, and retrospective documentation—forms the core of this case.

8. This action challenges whether a vulnerable autistic child was afforded the most basic safeguards required at psychiatric discharge, whether advocacy was met with retaliation, whether business executives intervened in the medical treatment of an autistic minor in this jurisdiction, and whether medical records and billing were altered to align with an outcome that had already been decided.

9. At its core, this case asks a simple question: whether a hospital system entrusted with the care of children can lawfully discharge an admitted autistic minor patient in a public lobby without safety planning, accuracy in documentation, or respect for protected advocacy—and then rely on institutional power to redefine what occurred.

## PARTIES

10. Defendant HCA Healthcare, Inc. ("HCA") is a Tennessee corporation with a principal office address of 1 Park Plaza, Nashville, TN 37203. It may be served at that address.

11. Defendant MH Mission Hospital, LLLP ("MH Mission") is a North Carolina limited liability limited partnership with a principal office address of 1 Park Plaza, Nashville, TN 37203. It may be served through its registered agent CT Corporation System at 160 Mine Lake Court, Suite 200, Raleigh, NC 27615.

12. Defendant MH Master Holdings, LLP ("MH Master Holdings") is a North Carolina limited liability partnership that, upon information and belief, owns, controls, or holds an ownership interest in Mission Hospital and its affiliated facilities. MH Master Holdings has a principal office address of 1 Park Plaza, Nashville, TN 37203, and may be served through its registered agent, CT Corporation System, at 160 Mine Lake Court, Suite 200, Raleigh, NC 27615.

13. Defendant MH Hospital Manager LLC ("MH Hospital Manager") is a North Carolina limited liability company that, upon information and belief, manages and oversees the operational, administrative, and compliance functions of Mission Hospital and its affiliated facilities. MH Hospital Manager has a principal office address of 1 Park Plaza, Nashville, TN 37203, and may be served through its registered agent, CT Corporation System, at 160 Mine Lake Court, Suite 200, Raleigh, NC 27615.

14. Defendant Melina Arrowood ("Arrowood") is a North Carolina resident who may be served at her office located at 509 Biltmore Avenue, Asheville, NC 28801.

15. Defendant Warren Deponti ("Deponti") is a physician who, upon information and belief, practices medicine in Asheville, NC and may be served at his office located at 32 Apex Circle, Asheville, NC 28803.

16. Defendant Matthew Edwards ("Edwards") is a physician who, upon information and belief, practices medicine in Asheville, North Carolina, and may be served at his office located at 32 Apex Circle, Asheville, North Carolina 28803.

17. Defendants also include John Does 1–25 and Jane Does 1–25, whose true names and capacities are presently unknown to Plaintiff, but who participated in or are otherwise responsible for the acts and omissions alleged herein.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

18. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq. and 12203, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and seeks redress for disability discrimination, failure to accommodate, and retaliation occurring in the provision of hospital-based psychiatric services to a minor patient.

19. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' related state-law claims because those claims form part of the same controversy as the federal claims.

20. Personal jurisdiction is proper in this Court as to all Defendants because the acts giving rise to Plaintiffs' claims occurred in substantial part within the Western District of North Carolina. Those acts were expressly directed at Plaintiffs in this District, caused harm in this District, and continue to cause harm in this District.

21. Defendants acted in concert and within the scope of a common plan, and the acts of each Defendant in furtherance of that plan are attributable to the others for the purposes of jurisdiction.

22. All conditions precedent to filing this action have been satisfied, excused, or have otherwise occurred.

## FACTUAL ALLEGATIONS

23. CHILD is Madson's child who is diagnosed with autism and admitted to the Mission ER with acute mental health concerns, including suicidality, requiring inpatient treatment.

24. CHILD previously received effective treatment at Sweeten Creek earlier in 2025, and CHILD personally requested to go back to Sweeten Creek for additional treatment after a rough start to the new school year. Sweeten Creek does not accept direct admittance, so it is only accessible through a transfer from the Mission ER. CHILD's parents made the decision to admit CHILD to the Mission ER with the objective of CHILD being transferred to Sweeten Creek.

25. At all times during CHILD's treatment, Defendants knew or should have known about CHILD's diagnoses including autism. The diagnosis is listed extensively throughout the medical record.

26. Madson had concerns about CHILD's treatment. Initially, the concerns were administrative in nature. There was a lack of information and then some misinformation about exactly when CHILD could be transferred from the ER to Sweeten Creek. The ER is not a therapeutic environment, rather it is only focused on immediate safety precautions. Madson sought to have CHILD transferred to Sweeten Creek as soon as possible so that therapeutic

treatment could begin. When a Physician's Assistant mistakenly told CHILD (and in front of Madson) that "transfer might be today" when in fact that was not true at all, and transfer wouldn't happen for three more days, Madson was particularly upset. Managing expectations for an autistic child is crucial, and Mission missed the mark here, but Madson accepts that this was essentially an administrative problem.

27. Soon thereafter, Madson's concerns about the operation of the hospital escalated rapidly after the occurrence of two events.

28. The first event occurred on Saturday August 23, 2025 around 1pm. Madson was denied access to see CHILD because a man and woman had arrived at the ER1 lobby to see their son, who had been separately transported to the ER about an hour prior, and the ER could not locate the child for approximately 15 minutes. The front desk closed during this timeframe. The mother became upset, and staff members pointed at a sign that referenced "aggressive behavior" of patients or visitors while telling her they may have her security remove her from the building because she was being "aggressive." Madson defended this woman to staff and went on to report this incident to multiple HCA employees during CHILD's stay at the hospital.

29. CHILD's medical record takes note of Madson's advocacy, stating the following:

"Father is frustrated about system issues…..[he] is advocating for his child. Although he is frustrated, he is redirectable."

30. For the first 4 days in the Mission ER, CHILD was not offered a shower. And when that occurred, the only person in the Green Pod unit was a trainee nurse who did not know where the shower was located, despite the fact that it was located in the bathroom only 15 or so feet away (which would indicate this person also may not even know where the bathroom was

located or at a minimum, has never actually been inside this bathroom). At this point, Madson is concerned about the shower situation but even more concerned that a trainee is the person in charge of the Green Pod unit for an extended period by herself. Madson recalls thinking of the "what if's" that could occur in the event of a serious problem such as physical violence or a suicide attempt with one of these children, with only one staff member present who does not appear to have awareness of even the basic layout of the unit.

31. At the time of admission, the medical record indicates that CHILD should have been offered showers:

> **Bathroom/Shower Privacy**, 08/22/25 10:09:00 EDT, Patient may have privacy in bathroom/shower room (designated as psych safe) at nursing discretion. Staff should be aware when patient is in bathroom or shower and provide close monitoring for potentially unsafe behavior.

32. Madson's continued advocacy led to a 20+ minute meeting with Charge Nurse Jonathon Gluck and a Mission "Patient Experience Manager."

33. In this meeting, Madson conveyed four primary issues: 1. Madson's perception that the hospital communication about the timing of transfer to Sweeten Creek was poor , 2. The fact that his child had not been offered a shower by staff in the first four days in the ER, 3. The incident in the ER1 lobby where Madson was a witness of the ER staff not being able to locate a child for more than 15 minutes, and 4. Madson's opinion that each of these issues could be directly correlated to understaffing. In the medical record, Gluck wrote a 500+ word summary about this meeting that did not include any reference to numbers 2, 3, and 4 in the prior sentence.

34. Gluck told Madson that it was hospital policy to offer showers to children every day. Madson told Gluck that did not appear to be happening.

35. Later on in the medical record, Deponti mentioned that "if the emergency room told him that they had a policy and were not following it (which is what he said happened), that it [sic] something that needs to be brought to their [ER staff's] attention."

36. Deponti would also mention that Madson's advocacy was focused beyond his own children and more broadly towards all children requiring inpatient treatment at these HCA facilities.

37. At the same time that Gluck was talking about how great the service was, he appeared disappointed in his own team: "No one from pysch clinician team ever came to see Fiona during my shift or to speak with father through out [sic] his several hours in hospital today.

38. In the medical record, Gluck mentioned that Madson was going "to reach out to people because of how we have proved absolutely unacceptable care."

39. Sometime between the conclusion of this meeting and September 2, Mission Health conducted an internal investigation into Madson's allegations that the hospital was not adhering to personal hygiene protocols for children in the ER psychiatric unit. The investigation involved "engagement with our ER leadership team" according to Cynthia Hunter who is a Patient Safety Coordinator at the hospital. This investigation was completed on September 2 and communicated to Madson in a letter dated the same day. The results of the investigation were as follows:

"With regard to your concern about daily showers, documentation in [CHILD's] medical record indicates that showers were offered each day but were declined by your [child]. Her personal hygiene needs were met, however, after her mother provided items from home on the day of her transfer to Sweeten Creek. We apologize for the distress these concerns may have caused and want to reassure you that we remain committed to supporting you and your family with compassion and transparency."

40. The medical record is approximately 700 pages. Madson has read every page. There is one reference to CHILD declining a shower and that occurred one time – immediately AFTER Madson advocated for hygiene standards for his child. Ms. Allen's letter is untruthful and

does not represent the facts. The medical record makes no reference to CHILD declining showers on multiple occasions.

41. A note in the medical record states that a nurse "explained what [sic, the inference being the word 'that'] he was being dishonest....these conditions are appropriate for the ER." Madson was referred to as being "dishonest," and the conditions in the ER were referred to as "appropriate."

42. On September 7 (two weeks after CHILD's discharge from the ER), CHILD's ER medical record was accessed and signed by a licensed physician named Zachary Foy.

43. Dr. Foy practices at several HCA facilities.

44. Dr. Foy administers ketamine at a house in Fairview, NC.

45. In the medical record, Gluck continues:

> "After our conversation I did discuss this with his RN and found out that the patient was offered showers and she refused. I agreed with his nurse that it was inappropriate for somebody to force a shower or hold her down and give them a bath wipe."

46. CHILD reports never being offered a shower. Madson or CHILD's mother estimate having been in CHILD's room at least 90% of the time during CHILD's ER stay, including overnight. Madson and CHILD's mother report that CHILD was never offered a shower in their presence.

47. Troublingly, the medical record infers that staff either considered a 'forced shower' or 'holding her down' – or, that Madson had requested that his own child be 'held down' and 'forced to shower' – Madson contends that thoughts of this nature have never crossed his mind and never would – full stop – and any reference to the same is both disgusting and inappropriate. Madson was only talking about the fact that showers were not being **offered** to children in this unit.

48. CHILD's medical record states "should the patient's father continue to be agitated and disrupt the milieu, he may be asked to leave." It continues "father continued to make statements about is not [sic] acceptable conditions…He talked about the incompetence he felt was present."

49. CHILD was transferred to Sweeten Creek. On CHILD's first night at Sweeten Creek, staff forgot to give CHILD three doses of medicine.

50. The following morning (8/28/25 at 9:27am), Madson received a call a nurse (herein referred to as "Nurse 1"). Nurse 1 called from phone number 828-213-4055 and notified Madson that CHILD did not receive scheduled medication the prior evening. Madson told Nurse 1 that missing a medication dose for any patient receiving inpatient acute stabilization psychiatric care seemed negligent, but especially for autistic minor who is unlikely to request the medication on her own. The call lasted 9 minutes and was concluded when Nurse 1 hung up on Madson.

51. Shortly thereafter at 9:53am, Madson received a call from another nurse (herein referred to as "Nurse 2"). Nurse 2 called from phone number 828-213-5227. Madson is concerned about not receiving any further information, so he decided to push the "record call" button on his cell phone. This was his first time touching the 'record button' on my cell phone and then the phone system audibly states "You are now recording the conversation." Nurse 2 asks if I'm recording the call and I say Yes. Nurse 2 hung up on Madson.

52. CHILD's medical record states "patient did not receive their scheduled Abilify, Intuniv, and Trazadone.

53. CHILD's medical record states the following: "One night early in her stay a dose of abilify was missed by nursing. Apologies for this oversight were given to parents and patient."

54. Deponti told Madson in person that the missed medicine was "the Abilify" and did not mention that staff also forgot the Intuniv and Trazadone.

55. CHILD's medical record also either contradicts itself, or Abilify was missed on two different occasions by Sweeten Creek, which would comprise a total of four missed doses for CHILD.

56. A few hours later, Madson has an in-person family appointment at Sweeten Creek with Dr. Warren Deponti. Deponti asked about the issues Madson had experienced and Madson mentioned each of them in great detail.

57. Madson mentions to Deponti that he is considering starting a social media campaign called WTF Mission to highlight the issues he's seeing. Madson mentioned that he has appeared in front of Asheville City Council before and that he might contact Council members in a formal or informal way, because the issues that CHILD is experiencing are probably being experienced by other children too – and Madson again mentioned his concern about children in the Mission system who are in the social services system and may not have a persistent advocate on their side. Madson mentioned that he believed each of the issues he was experiencing could be directly correlated to understaffing. Madson was very direct in this meeting, but at all times civil, cordial, not threatening anyone or anything, and not saying or even thinking about lawsuits as a result of his experience thus far. The conversation lasted over one hour according to Deponti's own notes in the medical record.

58. An HCA employee states in the medical record: "[Madson] has a plan to address the emergency department concerns."

59. On August 27 in the medical record, Deponti writes: "Would like to see improvement in insight and progress in family sessions with good outpatient and safety plans prior to discharge."

60. Once more, on August 28 in the medical record, Deponti writes the exact same thing: "Would like to see improvement in insight and progress in family sessions with good outpatient and safety plans prior to discharge."

61. Deponti continued:

> "I participated in family therapy for an hour 20 minutes where much of this was discussed in addition to discussing a medication that was missed (Abilify) yesterday and her father's complaints concerning the ER, which he will be discussing with the patient advocate."

62. Within about an hour or so of the conclusion of the Deponti in-person meeting, Madson receives a phone call from another person who says she is a nurse. She says her name is Melina. She calls from phone number 828-213-1219. Melina told Madson that he made Nurse 2 "uncomfortable" by attempting to record a phone call relating to the missed medicine. Madson mentioned that he thinks CHILD was probably "uncomfortable" when Sweeten Creek forgot to give her medicine. He continued that his daughter's safety – in what is proving to be a somewhat unsafe environment for children - is currently more important to him than Nurse 2's feelings. He also clarified that recording a phone call in North Carolina is legal. Madson mentioned that he doesn't miss medication doses at home, and he is a single parent with three children. This is an acute inpatient stabilization facility for an autistic minor, and they missed at least three medication doses immediately upon CHILD's admittance into the facility.

63. Deponti and Melina appear to have communicated at some time between the Deponti in-person meeting and Melina's call to Madson. Melina mentioned that Madson had ample opportunity to discuss the missed medication with Deponti. Melina told Madson that the Deponti meeting was the appropriate time to gather information about the staff not giving CHILD her medicine.

64. Madson recalls Melina being generally dismissive of his concerns. She even said something to the effect of 'anything else?'

65. The call lasts 11 minutes. Madson thinks Nurse 3's responses are unsatisfactory. Madson asks for her last name, she says "Arrowood," and Madson's final words are "I will be in touch."

66. Madson then googled "Melina Arrowood Asheville" on his cell phone and the first two search results were the HCA Mission Health Website and Arrowood's LinkedIn profile, both of which referred to Arrowood as the Chief Operating Officer of Mission Hospital.

67. Mission Health's website does not list a Chief Operating Officer.

68. On Linkedin, three healthcare executives claim that role – Arrowood, Brian Aston, and Michael Barbera.

69. CHILD's discharge appointment was scheduled for the next morning at 10am. Madson arrived at approximately 9:40am. He checked in with security and waited in the lobby.

70. At 10am, CHILD arrives in the Sweeten Creek lobby escorted by Nurse 4 (male, Caucasian, in his 30's) and Nurse 5 (female, Caucasian, in her 30's).

71. Madson verbalized to CHILD that he is so surprised she is up here and that it's much different than a prior discharge they had both been a part of. Madson was focused on his child but at the same time knowing something was off.

72. When CHILD crossed from the unit into the lobby, she was an admitted minor patient with unrestricted physical access to exit the building.

73. Nurse 4 leads the Lobby Discharge. Madson, CHILD, Nurse 4, and Nurse 5 are in a standing position the whole time. Madson and CHILD are not offered to sit down. Nurse 4 leads the appointment, talks fast, and appears visibly nervous. There is no table or flat surface to set the paperwork on. Nurse 4 has the papers fumbled around, continues to talk fast, and points at different things on the sheets of paper he's holding.

74. There is no therapist present.

75. There is no case manager present.

76. There is no licensed physician present.

77. There are at least 3 strangers present in the lobby.

78. Madson asked Nurse 4 something to the effect of "Do you guys typically do this up here in the lobby?" Nurse 4 stumbles and uses words that it's either 'quicker' or 'faster' or he may have said the words 'quicker and faster.'

79. The Lobby Discharge lasted 3 or 4 minutes. CHILD's medical records indicate HCA staff recorded the discharge at 10:06am. The appointment was scheduled for 10am and Madson recalls it starting on time.

80. The discharge paperwork that was placed in Madson's hand by Nurse 4 was printed by HCA staff at 9:35am.

81. There were multiple strangers present for Lobby Discharge, but one was present the entire time and in extremely close proximity, only 4-5 feet away. Madson seeks to clarify that he is not speaking about "5 feet" in a figurative way. If there was a tape measure between him/CHILD and this woman, he estimates it would read 4-5 feet.

82. Nurse 4 concludes the appointment by asking "is there anything else you need?" and Madson responded that "the only thing we NEED is to have a bunch of fun this weekend!" CHILD smiled, Madson smiled, Madson placed his arm around CHILD, and Nurse 4 smiled. The stranger who attended the appointment also smiled.

83. Madson's most recent communication of any kind with HCA prior to the Lobby Discharge was the phone call from Arrowood.

84. Deponti approved the discharge.

85. Edwards was the Attending Physician for the discharge.

86. After settling in with CHILD at home, Madson called Melina and left a message that he had questions about the discharge. She never responded.

87. Madson was quite upset after the Lobby Discharge and starting that night, he ended up not eating or sleeping for several days while he focused on researching the applicable rules for how a psychiatric discharge should be handled for an autistic minor.

88. Madson and CHILD were participants in a prior discharge appointment at Sweeten Creek on February 14, 2025. That appointment occurred in a private soundproof room in the adolescent unit and lasted somewhere between 45 and 60 minutes. The appointment included CHILD's case manager/therapist, a licensed physician, and nursing staff. All parties were seated at a table at all times they were in the appointment room. Each of the seven components of a Sweeten Creek Patient Safety Plan were completed in a detailed manner and reviewed with CHILD via teach back. CHILD's Personal Safety Plan from February 14 is copied below:



89. The redacted portions of the image posted above contain detailed personalized strategies that were created during and after in-depth conversations with CHILD to seek CHILD's input.

90. The Patient Safety Plan image is pulled directly from CHILD's medical record from February 2025.

91. The February 2025 Patient Safety Plan was discussed in great detail with CHILD and CHILD's parents in a family meeting prior to the discharge and then again in the discharge appoint itself.

92. CHILD's Personal Safety Plan from August 29 is copied below.

**Patient Education Given**

**Personal Safety Plan**
What makes you angry/upsets/cause crisis: Unable to Assess
People I call to help me cope: unable to assess
People/social setting that can distract: unable to assess
Strategies for making environment safe: Other: unable to assess
Makes life worth living/important to me: unable to assess
Signals of distress lose control/upset: Unable to Assess
Calming strategies: Unable to Assess

Teach Back of D/C Instructions:

Teach Back of D/C Instructions Completed: Transition record discussed and provided to patient/representative

93. "Unable to Assess" is listed next to each of the seven components of the Personal Safety Plan.

94. CHILD was diagnosed with suicidality and discharged without a Patient Safety Plan.

95. CHILD's Personal Safety Plan lists "UNABLE TO ASSESS" next to what "Makes life worth living."

96. In a psychiatric discharge appointment for an autistic adolescent, teach-back is a critical safety safeguard to confirm understandings about discharge, reduce anxiety, and prevent post-discharge harm. Yet in CHILD's Lobby Discharge the teach back was entirely absent.

97. The February 14 discharge included teach back. The August 29 discharge did not include teach back. The medical record relating to the August 29 indicates that there was teach back.

98. In the medical record, an RN named Daniel Billings mentioned that the discharge appoint teach back occurred at 9:35am that day – 25 minutes before the discharge appointment even occurred – and even, there was still no teach when the 3-4 minute appointment did start. The medical record is falsified as it relates to teach back.

| **BH Teach Back** |
| --- |
| *Teach Back of D/C Instructions Completed :* Transition record discussed and provided to patient/representative |
| Billings RN, Daniel H - 08/29/25 09:35 EDT |

99. In the medical record, Billings would also go to mention that he talked about CHILD's suicidality and homicidal thoughts in the public lobby discharge appointment with multiple strangers nearby.

```
Textual Results
T6:   8/29/2025 10:06 EDT (Discharge Comments)
      Patient continued to deny SI/HI while committing to safety. Both patient and
      guardian confirmed understandingof discharge instructions.
```

100. Deponti appears to have been inside the Sweeten Creek building at the time of the Lobby Discharge (but was not in attendance for the Lobby Discharge). He e-signed various items in

the medical record timestamped at times before and after the Lobby Discharge. He e-signed one additional item in the medical record on the following day, August 30.

101. The billing related to the Lobby Discharge was represented as follows to Madson when HCA tried to collect payment for its services:

08/29/25 to 08/29/25    WARREN K DEPONTI, DO           $182.00
Facility: PEDIATRIC BEHAVIORAL HEALTH    Claim: 106637284
    HOSP DISC >30MIN
Please phone our office to arrange a payment plan. Thank you.

102. The Lobby Discharge on August 29 was coded as a "Hospital Discharge Greater Than 30 Minutes." The Lobby Discharge lasted 3 or 4 minutes, and Deponti was not present at the appointment. The billing is false.

103. And on the prior day, Madson was charged for his time spent with Deponti, the vast majority of which was Madson highlighting hospital issues. In this way, he was charged for airing grievances and offering serious feedback as a patient advocate.

104. On September 4, Madson delivered a litigation hold and evidence preservation letter to HCA's Chief Legal Officer Michael McAlevey. The letter was addressed to HCA Healthcare Inc. and Melina Arrowood. Attorney McAlevey did not respond but HCA's and Arrowood's law firm, Roberts & Stevens PA, later confirmed that McAlevey received this notice on September 4.

105. In the letter to Attorney McAlevey, Madson requested a follow-up parent-only discharge appointment because he felt like the first discharge appointment was insufficient.

> "I'm requesting a parent-only follow-on discharge appointment. The discharge was so rushed in the lobby, and the nurses were talking so fast and I feel like the safest thing for my daughter is for me to personally walk through the discharge information again…I left Melina a voicemail with questions about the discharge and she did not call me back. It's been 6 days."

106.   Madson contacted the North Carolina Medical Board concerning CHILD's treatment. The NC Medical Board subsequently opened two investigations, one concerning Deponti and one concerning Edwards.  To the best of Madson's knowledge, those continue to be open investigations.

107.   On October 18, Madson delivered an evidence preservation letter to Deponti.  The letter was addressed to Deponti.  Deponti's attorney, Roberts & Stevens PA, replied to it and confirmed that Deponti received this notice on or around October 18.

108.   The evidence preservation letter encouraged HCA-employed to escalate internal reporting because Madson stated the claims were so serious and involved a vulnerable special needs child, and many of the issues could have only occurred in a purposeful way, and they certainly involved the second highest ranking official in the Mission system.

109.   The evidence preservation letter was received by Sam Hazen, HCA's corporate Chief Executive Officer on October 18.

110.   On October 20 at 6:04am, Madson emailed Ruth Kain, who is HCA's Chief Nursing Officer at Mission according to its website.   Madson's words were: "I want to bring the conduct of at least 4 nurses to your attention, while also mentioning that a business executive purported to be a nurse in a recent interaction with me."

111.   That same morning at 6:59am, Madson emailed the licensed medical professionals who are members of Mission's Board of Trustees according to the Mission website (Dr. Alex Schneider, Dr. Donald Gajewski, Dr. Gregory Campbell, and Dr. William Shillinglaw). Madson's words were "I'm reaching out to you concerning hospital misconduct during the

treatment of my daughter, an autistic minor…My opinion is this matter qualifies for review by the Quality, Safety, and Service Committee."

112. Also that same morning at 7:22am, Madson emailed HCA employee Cynthia Hunter after receiving a letter from Ms. Hunter in September. Hunter had reached out to Madson because of Madson's concerns about children not being offered showers in the Green Pod. Madson asked Ms. Hunter to "please escalate this internally."

113. October 20, HCA opened an internal investigation into one or more of Madson's concerns. In a letter dated December 12 and sent to Madson, HCA employee Emily Allen wrote:

> "We are writing to inform you that on October 20, 2025, we discovered information contained in [CHILD] medical record at Mission Hospital may have been inappropriately disclosed on August 29, 2025. Mission Hospital thoroughly investigated this situation and determined [CHILD] first and last name, medications, and follow-up appointment information, when verbally communicated by workforce members during the discharge process, may have been inadvertently overheard by an unauthorized third party.
>
> We have addressed the situation and are taking steps to prevent such incidents from happening in the future. The workforce members were appropriately sanctioned in accordance with facility policy and retained on the appropriate safeguards to use when discussing patient information. We are also in the process of retraining our workforce concerning our privacy policies.
>
> We are committed to the property handling and protection of your information. In the event you have any questions or concerns, please do not hesitate to contact me at 828-213-8541 and Emily.Allen4@HCAHealthcare.com. We sincerely apologize for any inconvenience this may have caused.

114. Emily Allen signs the letter as the "Facility Privacy Official." Her LinkedIn profile also references her job title as the Assistant Ethics and Compliance Officer. In this letter, Allen admits that something occurred relating to CHILD's treatment that merited employee sanctions, a workforce retraining, and an apology.

115.   HCA and several other Defendants hired law firm Roberts & Stevens, PA to interact with Madson.   On the same day that Madson sent advocacy emails to Mission (October 20, timestamped at 6:04am, 6:59am, and 7:22am), Roberts & Stevens began sending cease-and-desist communication to Madson that he should only contact the law firm and never contact the hospital about this matter.

116.   Madson is not an attorney, and there was no active litigation at all times during which HCA's attorneys sent him cease-and-desist communication.   The evidence preservation letter mentioned that Madson was not an attorney.

117.   Various aspects of CHILD's treatment conflict with HCA's Healthcare Code of Conduct, which is signed by HCA CEO Sam Hazen and allegedly required to be acknowledged and signed by every HCA employee.   This Code of Conduct is Exhibit A to this Complaint.

118.   For all of the issues experienced by Plaintiffs in this ordeal, and Madson's associated across-the-board advocacy during that timeframe, Madson has essentially received only 3 communications from HCA:

   a.   The Cynthia Hunter letter which misrepresents the medical record.

   b.   Cease and desist communication from HCA's attorneys telling Madson he is not allowed to contact the hospital anymore.

   c.   Confirmation that CHILD's personal information was shared with unauthorized third parties.

**NOTICE REGARDING FORTHCOMING MEDICAL NEGLIGENCE CLAIMS**

119.   Plaintiff alleges that aspects of the medical care, discharge planning, supervision, and related conduct provided to Plaintiff's minor child fell below applicable standards of

care. Plaintiff has made good-faith efforts to consult with qualified medical experts but has been unable to secure expert participation at this time. Each expert has cited Plaintiff's pro se status as the reason they are unable to evaluate this matter. Plaintiff continues to seek a qualified medical expert. To avoid prematurely asserting a medical negligence claim without expert review or certification, Plaintiff does not assert a medical malpractice count in this Amended Complaint, but provides notice that such claims are anticipated and will be asserted upon completion of expert review, and Plaintiff expressly reserves the right to further amend this Complaint pursuant to Rule 15(a)(2).

## COUNTS

For each Count, every prior paragraph in this Complaint is realleged and incorporated by reference as if fully set forth herein.

### COUNT I
Federal Cause of Action
ADA Retaliation
42 U.S.C. § 12203

120.     Defendants subjected CHILD and Madson to materially adverse actions, including an atypical, rushed, and non-private discharge process, because of Madson's protected advocacy on behalf of a disabled child and his complaints regarding unsafe conditions for children in the hospital's care.

### COUNT II
Federal Cause of Action
Emergency Medical Treatment and Labor Act ("EMTALA")
Failure to Provide Appropriate Medical Screening and Stabilization
42 U.S.C. § 1395

121.　CHILD presented to the Mission Hospital emergency department with an emergency psychiatric condition. Defendants were required under EMTALA to provide appropriate screening and stabilizing treatment prior to transfer.

122.　Defendants failed during CHILD's emergency department stay to provide stabilizing conditions of care, including adequate supervision and basic patient safety safeguards, as evidenced by prolonged boarding in the ER, failure to provide basic levels of hygiene to its adolescent patients, and an incident in which emergency department staff were unable to locate a pediatric patient under their care.

123.　These conditions demonstrate that CHILD's emergency psychiatric condition was not stabilized in the emergency department prior to transfer, constituting a failure to meet EMTALA's stabilization requirements. Documentation was altered to make it appear that EMTALA requirements were satisfied when they were not.

COUNT II
Federal Cause of Action
Disability Discrimination – Failure to Accommodate
Americans with Disabilities Act, Title II
42 U.S.C. § 12132

124.　Defendants knew CHILD was autistic and required disability-related accommodations, and knew about the American Americans with Disabilities Act (or should have), yet failed to provide reasonable modifications necessary for effective communication and safe psychiatric discharge, including accommodations related to comprehension, processing time, privacy, and discharge instruction.

125.　The absence of these accommodations deprived CHILD of meaningful access to psychiatric discharge services and placed her at heightened risk of harm.

COUNT III
Federal Cause of Action

Disability Discrimination – Failure to Accommodate
Section 504 of the Rehabilitation Act
29 U.S.C. § 794

126.     Defendants, while receiving federal financial assistance, excluded CHILD from and denied her the benefits of safe and accessible psychiatric discharge services by reason of her disability, despite knowing her diagnosis and associated needs.

127.     Defendants' conduct reflects systemic disregard for disability-based communication requirements in acute psychiatric settings.

128.     The temporal proximity between protected advocacy and the altered discharge process supports a plausible inference of retaliatory motive.

COUNT V

Federal Cause of Action

Section 504 Retaliation

29 U.S.C. § 794(d)

129.     Defendants intentionally interfered with and retaliated against efforts to secure disability-related protections for CHILD, thereby discouraging and punishing advocacy intended to ensure safe and lawful treatment.

130.     Retaliation against disability advocacy undermines both federal law and public accountability mechanisms.

COUNT VI

Federal Cause of Action

Civil Conspiracy to Interfere With Federal Rights

42 U.S.C. § 1983

131. Defendants acted jointly and in concert to interfere with Plaintiffs' federally protected rights, including rights secured under federal disability law and the right to engage in patient advocacy without reprisal.

132. The coordinated nature of Defendants' actions reflects agreement and shared intent.

## COUNT VII
### State Cause of Action
### Intentional Infliction of Emotional Distress

133. Defendants engaged in extreme and outrageous conduct, including conducting a psychiatric discharge of a suicidal autistic minor in a public lobby and engaging in retaliatory conduct toward her parent, with intent to cause or reckless disregard for the likelihood of severe emotional distress.

134. Such conduct exceeds all bounds of decency tolerated in a civilized society.

## COUNT VIII
### State Cause of Action
### Negligent Infliction of Emotional Distress

135. Defendants negligently engaged in conduct that they knew or should have known would cause severe emotional distress to a vulnerable minor and her parent, and such distress was in fact suffered.

136. The emotional harm was foreseeable and proximate.

## COUNT IX
### State Cause of Action
### Fraud and Constructive Fraud

137.   Defendants made false representations and material omissions in medical records and

billing, including falsely documenting discharge procedures, falsely indicating completion of

teach-back, and misrepresenting the duration and substance of psychiatric discharge services.

138.   Accurate medical records are foundational to patient safety and accountability.

## COUNT X

### State Cause of Action

### Civil Conspiracy

139.   Defendants acted pursuant to a common plan and agreement to commit unlawful acts,

resulting in injury to Plaintiffs.

## COUNT XI

### State Cause of Action

### Negligent Supervision and Retention

140.   Defendant hospital entities failed to properly supervise and retain employees and

executives who engaged in retaliatory conduct, misrepresentation, and unsafe discharge

practices.

## COUNT XII

### State Cause of Action

### Unfair and Deceptive Trade Practices

### N.C. Gen. Stat. § 75-1.1

141.   Defendants engaged in unfair and deceptive acts affecting commerce by misrepresenting

the nature, safety, and documentation of psychiatric discharge services and attempting to

collect payment for those same misrepresentations.

## COUNT XIII

### State Cause of Action

Interference With Parental Rights

142.   Defendants unlawfully interfered with Madson's right to participate meaningfully in
medical decision-making and advocacy for his minor child.

## COUNT XIV
### State Cause of Action
### Spoliation and Obstruction of Evidence

143.   Defendants altered, delayed, or misrepresented medical records both before notice of
potential litigation and after notice of potential litigation.

## COUNT XV
### State Cause of Action
### Negligent Supervision

144.   Defendants negligently supervised their staff by permitting inadequately trained and
unsupervised personnel, including corporate executives, to manage vulnerable psychiatric
patients and conduct high-risk discharge procedures without appropriate oversight, thereby
creating unsafe conditions that proximately caused harm.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Bill Madson and CHILD request that this Court enter
judgment in our favor and against all Defendants, jointly and severally, and further:

   a.   Award us compensatory damages to be determined by a jury on each of the
above-stated counts; and

   b.   Award us punitive and exemplary damages, in an amount to be determined by a
jury, on each of the above-stated counts; and

   c.   Tax the prejudgment interest of the damages, attorneys' fees and costs of

this action to the Defendants, as of the date of the filing of this Complaint; and

d. Award us such other and further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Madson respectfully demands a trial by jury with respect to each claim in this Complaint.

This the 8th day of January, 2026.

Respectfully submitted,

_____
Bill Madson
Pro Se Plaintiff
Address:     33 Pheasant Drive
          Asheville, NC 28803
Mobile:     404-226-2040
Email:     bill@cliftontrust.com