## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| BILL MADSON, individually and as next friend of CHILD, a minor, <br><br> Plaintiffs, <br><br> v. <br><br> HCA HEALTHCARE, INC. and <br><br> MH MISSION HOSPITAL, LLLP and <br><br> MH MASTER HOLDINGS, LLP, and <br><br> MH HOSPITAL MANAGER, LLC, and <br><br> MELINA ARROWOOD, and <br><br> WARREN DEPONTI, and <br><br> MATTHEW EDWARDS, and <br><br> JANE DOES 1-25, and <br><br> JOHN DOES 1-25. <br><br> Defendants | FILED <br> ASHEVILLE, NC <br><br> FEB 0 4 2026 <br><br> U.S. DISTRICT COURT <br> W. DISTRICT OF N.C <br><br><br> Case # 1:25CV455-MOC-WCM |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT HCA HEALTHCARE, INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

The essence of HCA's 12(b)(2) is their view that they are merely an investor in Mission. Similar to how an individual investor might purchase some Apple shares for their 401k, HCA has just purchased some Mission shares, and the arrangements are of a

similar context - that of a 'passive non-controlling equity holder' - HCA wants the Court to believe that its investment in Mission is a hands-off arrangement.

This response contains prima facie evidence to the contrary. In *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.,* (334 F.3d 390 (2003), the Fourth Circuit established that "the plaintiff need only make a prima facie showing of personal jurisdiction." See also *Alexander v. Avenue* (473 F.Supp.3d 551 (2020)) where the Eastern District of Virginia emphasized that "a plaintiff need only make a prima facie showing of personal jurisdiction to survive a motion to dismiss for lack of personal jurisdiction."

It makes sense that HCA may want to distance itself from Mission given the numerous well-articulated concerns from patients, employees, the Centers for Medicare and Medicaid Studies (CMS), the North Carolina Department of Health and Human Services (NC DHHS), NC Governor Josh Stein, and NC Attorney General Jeff Jackson.

But their argument falls flat. They are not a passive equity holder. In fact, HCA is the reason for the extreme and extraordinary safety problems at Mission, and HCA takes many affirmative steps to influence and control matters relating to Mission. HCA is an incredibly active entity in North Carolina.

Within a day or so of filing the 12(b)(2), Mission CEO Greg Lowe produced a co-branded HCA/Mission letter that was delivered to Mission employees stating that CMS has placed the facility into its fourth Immediate Jeopardy since the HCA takeover.

HCA derives approximately 55% of its revenue from CMS according to its own representations. An Immediate Jeopardy identification is a notice that patient safety is such a concern that CMS may terminate its provider agreement, which would remove

Mission's ability to receive Medicare and Medicaid. It's the most serious sanction that a federal agency can place on an operating hospital facility. HCA understands the importance of CMS to its enterprise. In a recent 10-k filing with the Securities and Exchange Commission, HCA mentioned CMS 129 times.

The Fourth Immediate Jeopardy letter came from Mission CEO Greg Lowe. The Fourth Immediate Jeopardy is an extraordinary event. Upon information and belief, this is the first time this has happened at a megahospital (500+ beds) – not just at Mission – but more troublingly, this may never have happened before in the history of the American medical system. Four IJ's for a megahospital appears to have no precedent in the United States.

CMS defines Immediate Jeopardy in the following way (Exhibit A):

"Immediate Jeopardy (IJ) represents a situation in which noncompliance by providers, suppliers, or laboratories (hereinafter referred to as "entities") has placed the health and safety of recipients in its care at risk for serious injury, serious harm, serious impairment, or death. These situations must be accurately identified by surveyors, thoroughly investigated, and resolved by the entity as quickly as possible. In addition, noncompliance cited at IJ is the most serious deficiency type and carries the most serious sanctions for entities. An IJ situation is one that is clearly identifiable due to the severity of its harm or likelihood for serious harm and the immediate need for it to be corrected to avoid further or future serious harm.

On January 26, CMS sent Lowe a letter to his HCA email address outlining the situation (Exhibit B):

"This survey found that the hospital was not in compliance with the Medicare Conditions of Participations and that the noncompliance posed Immediate Jeopardy to patient's health and safety...Due to the findings of IJ deficiencies, CMS has removed the deemed status of your hospital."

The letter continues that CMS has identified "systemic and recurring patterns of noncompliance" and that:

"If Memorial Mission Hospital and Asheville Surgery Center has not achieved substantial compliance by July 26, 2026, the Medicare provider agreement between the hospital and the Secretary of the Department of Health and Human Services may be terminated."

CMS produced a "Statement of Deficiencies and Plan of Correction" relating to the Fourth Immediate Jeopardy (Exhibit C). The child involved in this litigation is Patient #20 in the report. The report states (underlining performed by Plaintiff):

Closed medical record review revealed a 14-year-old, Patient #20, was admitted to the hospital's mental health facility on August 25, 2025, through August 29, 2025. Review of the orders for medications reflected that orders for Aripiprazole, also known as Abilify, a medication used to treat mental health conditions, 5 milligram tablet, Guanfacine 1 milligram, a medication used to treat attention-deficit hyperactivity disorder, and Trazodone 50 milligrams, used to treat depression, each by mouth every night at bedtime. Each medication order started on August 22, 2025, at 10:21 PM while the patient was in the emergency department awaiting admission to the mental health facility. Medication administration report review noted that on August 26, 2025, the patient did not receive her night shift medications scheduled to be given at bedtime. Review of the medication administration report revealed that on August 27, 2025, Patient #20 was administered Abilify on August 27, 2025, at 9:25 AM to cover for the missed dose. Nursing documentation for the dayshift indicated that this was a verbal order, but the order was not documented. Patient event record medication error, event number 55016, was reviewed. The medication dose reported as being omitted was aripiprazole. The guanfacine and trazodone were not reported as missed on the event report yielding an inaccurate report. Documentation on August 27, 2025, at 10:48 AM by the nurse assigned during the shift noted all three medications and the notification of the provider and patient's father.

Event investigation methods selected were "interviewed direct care provider or staff" and "reviewed medical record." The selections of "discussed with department director or manager" and "met with leaders to identify actions to implement to prevent recurrence" were not selected. Primary action to prevent recurrence was documented as coaching. The staffing of the unit and the clinical nurse coordinator review of the medication documentation were not addressed in the incident report. During a phone interview with Registered Nurse #31, who was assigned to Patient #20 during the night shift of August 26, 2025, revealed that he had "tag-teamed" with the clinical nurse coordinator to complete medications that shift because he and the clinical nurse coordinator were the only nurse staff for the shift. Registered Nurse #31 stated on August 26, 2025, at 11:16 PM that "the patient took their medication without incident." He stated he documented medications given without incident because he thought the clinical nurse coordinator had administered the medications. Registered Nurse #31 was notified by the dayshift nurse that the doses had not been documented. He

contacted the clinical nurse coordinator who thought he had administered the patient's medications. Registered Nurse #31 stated Patient #20 was the last one on his page and the medications were listed on another page that he did not scroll to. The medications may have been on the clinical nurse coordinator's page, so he did not realize that the medications were not given. He reported this was his fifth month as a new graduate nurse and this was a revamped process, and he did not know he needed to scroll to see additional information. Registered Nurse #31 reported he was educated by his manager. He reported there are usually two nurses on B side, which is the patient location, and one on A side with a clinical nurse coordinator floating between the units. It was not known why staffing had been decreased.

In the case of Patient #20, a 14-year-old mental health patient, three bedtime medications were not administered on August 26, 2025, due to inadequate staffing with only two staff members, a new graduate nurse in his fifth month and a clinical nurse coordinator, responsible for the entire unit. The night shift nurse falsely documented that the patient took medications without incident when no medications were given. The incident report documented only one of the three omitted medications, did not investigate the root cause of inadequate staffing, and listed the only corrective action as coaching. The nurse director confirmed that typical staffing includes two nurses on B side, one nurse on A side, and one float clinical nurse coordinator, not the two-person staffing that occurred that night. The incident was dismissed as human error requiring only re-education, ignoring the systemic staffing failure that created an unsafe environment.

The Lowe/HCA/Mission letter is publicly available through local news sources and is also found in Exhibit D to this filing. The corporate branding is screenshotted below. The hospital is on the verge of losing its CMS provider agreement – for the fourth time – and HCA branded the notification letter to Mission employees. That is not the work of a passive equity holder. It's not possible to view this image and think HCA is not directly involved in the hospital. When Lowe writes in first person plural ('We') and HCA's logo is at the top of the letter, he is speaking for HCA as well. This serves as prima facie evidence.



Mission Health colleagues,

Tonight we submitted to CMS updates to our more extensive and comprehensive plan of correction, about which I emailed you on January 15. The plan focuses on our programs to

The Fourth Circuit applies this test to determine personal jurisdiction over nonresident defendants: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims arise out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable." *Tire Engineering and Distribution, LLC v. Shandong Linglong Rubber Co., Ltd.,* 682 F.3d 292 (2012). HCA has purposefully availed itself in a number of ways outlined in this response - the Plaintiff's claims come from Mission Hospital - HCA governs the behavior of Misson employees (and is active in North Carolina for many other reasons as well) - HCA remaining a defendant in this case is constitutionally reasonable.

*Tire Engineering* also holds that the defendant purposefully availed themselves where they "substantially collaborated with a forum resident and that joint enterprise constituted an integral element of the dispute." HCA handles governance, billing, employee policy, the training of nurses, debt collections, the Mission websites, and many other integral functions. But even by itself, Greg Lowe's Fourth Immediate Jeopardy letter (from last week) to Mission Employees was a co-branded communication for HCA

and Mission, indicating that the hospital may operate as a "joint enterprise" between HCA and Mission.

Lowe's letter mentions that grievance process needs to be improved. Plaintiff agrees. Lowe mentions that some patients are so concerned that they are contacting CMS directly. Plaintiff can confirm that is true, as he is a supplemental complainant with CMS, starting in mid-October 2025, during the Third Immediate Jeopardy.

After contacting HCA's top in-house lawyer and being ignored, and then having HCA's chosen local law firm attempt to silence him, the Plaintiff spent at least 50 hours building a file for CMS to review. Plaintiff distributed the same to CMS and has added to the file as more facts have become available.

HCA may control or have access to the video footage of Plaintiff's child's discharge appointment in the lobby of Sweeten Creek. In the adjacent case, Attorney Phil Jackson signed a declaration stating that HCA employee and highest-ranking legal officer Michael McAlevey received an evidence preservation letter from Plaintiff on or around September 3. Jackson stated: "Our clients have reviewed the Legal Hold Notice and understand that the Legal Hold Notice may impose certain duties on them."

That notice was issued to Mission and HCA.

September 3, 2025

Via Email  Michael.McAlevey@hcahealthcare.com

Michael McAlevey
Executive Vice President, Chief Legal and Administrative Officer
HCA Healthcare / Mission Hospital / Sweeten Creek Mental Health Center
HCA Healthcare
One Park Plaza
Nashville, TN 37203

The notice created an obligation for Attorney McAlevey to take affirmative steps to preserve the video evidence. McAlevey appears to be an HCA employee, not a

Mission employee. The Court stated: "And if Mission violates this obligation, the Court will issue appropriate sanctions to remedy the violation during litigation." If for no other reason, HCA must stay in this case until there is more information about the video evidence.

McAlevey also had an obligation to report the incident internally because of the HCA Code of Conduct. The Code states "While all HCA Healthcare colleagues are obligated to follow our Code, we expect our leaders to set the example, to be in every respect a model." The allegation is purposeful medical misconduct directed at a suicidal autistic child, who was discharged with no safety plan among a litany of other violations, with precedent misrepresentations by Mission COO Melina Arrowood. It appears that Mission opened an investigation into the matter on October 20. Whatever HCA did or didn't do from September 3 through October 20 is relevant to this case.

Given Mission Health's repeated CMS Immediate Jeopardy findings and the resulting threat to its Medicare participation, the financial capacity of the Mission entities to satisfy a judgment is uncertain. HCA Healthcare, as the parent entity that governs compliance, controls enterprise systems, and benefits financially from Mission's operations and has already received Plaintiff's payments, is the only defendant capable of providing complete and effective relief. Exercising jurisdiction over HCA is therefore fair and reasonable. On September 30, 2025 HCA had cash on hand of $997,000,000 and accounts receivable more than $10 billion. Today, Mission stands to lose half of its revenue in the next few months and damages may not be calculated before then. The evidence in this case so far surpasses the four-factor Rule 19 (see Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102 (1968)). courts consider "the interest of the

courts and the public in complete, consistent, and efficient settlement of controversies." It's a practical necessity that HCA remain in this case.

All of Mission's 10,000+ employees are required to sign and acknowledge the HCA Healthcare Code of Conduct (Amended Complaint, Exhibit A). They must sign it to get hired, and they have to re-sign it every year to keep their job (Exhibit E) – that document states,

> "Within 30 days of being hired, each new employee…must receive a copy of or be provided the opportunity to electronically review the Code; acknowledge such review; acknowledge the Code represents mandatory policy; and agree to abide by the Code."

The acknowledgment card includes references to the employee's Social Security Number (last page of Exhibit A to the Amended Complaint). There are various updates to the HCA Code of Conduct every year and those updates appear to come only from HCA and never Mission or its affiliates. HCA represents that the Code represents "mandatory policy." The cover letter is signed by HCA Chief Executive Officer Sam Hazen. Hazen received Plaintiff's various factual allegations on October 18. The Code states:

> The CEO and all Senior Financial Officers are bound by all provisions of this Code of Conduct and particularly those provisions relating to ethical conduct, conflicts of interest, compliance with law, and internal reporting of violations of the Code.

In another amendment to the Code, HCA states, "No one may falsify or inappropriately alter information in any record or document" (Exhibit F, #7, first page).

In another amendment to the Code (Exhibit G, #1, first page), HCA states,

> "The Company is committed to maintaining compliance with all applicable laws, rules and regulations to prevent misconduct and correct inappropriate behavior wherever it may occur in our organization."

HCA cannot impose a mandatory, annually reaffirmed Code of Conduct governing patient care, retaliation, and record integrity on thousands of North Carolina employees while disclaiming purposeful contact with North Carolina. The Code of Conduct is prima facie evidence that HCA is heavily engaged in North Carolina activities.

Plaintiff does not assert that the Code alone establishes liability. Plaintiff does not assert the Code creates an employment relationship. Plaintiff asserts the Code establishes purposeful availment and control. There are at least 10,000 citizens of the Western District tethered to this unilateral contract. This defeats HCA's characterization of itself as a passive, non-operating holding company. HCA controls more workers than any other employer in Western North Carolina.

The Fourth Circuit is clear that a defendant purposefully avails itself of North Carolina where it deliberately structures relationships that are ongoing and where it derives financial or economic benefit from activity based in the forum, even if it characterizes itself as operating elsewhere. *IHFC Properties, LLC v. APA Marketing, Inc.*, 850 F.3d 760 (4th Cir. 2017). As it relates to the Code of Conduct, HCA purposefully structures the relationship between Mission employees and their employer, and as an equity holder, stands to profit from hospital operations.

The Code is updated from time to time and contains an adjacent set of documents that HCA refers to as its Compliance Policies and Procedures. One of those documents is an HCA directive about the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973. This case involves an autistic child that was supposed to be

protected by these federal laws and by HCA's own standards that they set for Mission employees in North Carolina. The ADA/504 document was produced by HCA's Culture and Values Department and approved by its Ethics and Compliance Policy Committee. Its stated purpose is "To ensure compliance with any applicable public access provisions of the Americans with Disabilities Act (ADA) [and] Section 504 of the Rehabilitation Act of 1973."

The document is located at Exhibit H and states the following:

"All employees, subcontractors, and vendors must carry out their roles and responsibilities in a manner that is in compliance with the ADA and related nondiscrimination laws."

"HCA Healthcare-affiliated facilities are required to follow this."

"Access Compliance Coordinator and Director of Facility Management, respectively, must report all ADA complaints, problems or incidents, whether informal or formal to facility administration including the facility ECO and the respective ADA Responsible Executive or designee."

Mission's name is nowhere to be found in the Code or the ADA/504 document. HCA makes these policies on their own and enforces them in North Carolina. Many of the policies directly impact this case.

For all the CMS safety sanctions handed down to Mission by CMS, HCA is thriving financially. The 5-year chart below shows its stock skyrocketing during Mission's four Immediate Jeopardy time periods. The stock price nearly tripled over the same period, resulting in an over $70 Billion increase in market capitalization, while earning approximately $28 Billion in free cash flow during the same period of time. The financial results are extraordinary. This information is freely available through the Securities and Exchange Commission.



HCA is making so much money while apparently having many patient safety issues at Mission, and then trying to shield themselves from any resultant liability.

Every hospital-related email address used in connection with the events at issue, including the email addresses of each individual defendant, is an @hcahealthcare.com email address. HCA Healthcare appears to have a centralized corporate email system, while Mission does not appear to have its own centralized corporate email system, or at least not one that they actively use. This reflects operational integration rather than incidental branding. Emails constitute core evidence in discovery in both of Plaintiff's cases, and HCA's control over the email infrastructure through which relevant communications occurred further demonstrates its direct involvement in, and purposeful contact with, hospital operations in North Carolina. When CMS needed to contact Lowe about possibly removing their financial support from the hospital, they used his HCA email address. This is additional prima facie evidence that personal jurisdiction is appropriate.

On Linkedin and Facebook, Mission's top two corporate executives (Lowe and Arrowood) state that HCA is their employer, and they do not mention Mission.

Arrowood quotes HCA co-founder Thomas Frist on one of her profiles: "There is so much good to do in the world, and so many ways to do it." These materials may be found at Exhibit I. This is additional prima facie evidence that personal jurisdiction is appropriate.

Shortly after purchasing Mission, HCA purchased the Galen College of Nursing, a national provider of nurse training (Exhibit J). In December 2022, Galen (now owned by HCA) opened up a 17,000 square foot training center in Asheville's Biltmore Park mixed-use development. HCA has trained some nurses, probably a lot of nurses, to work at Mission, for Mission is likely the largest employer of nurses in Western North Carolina. This is additional prima facie evidence that personal jurisdiction is appropriate.

On Galen's website, it states:

"During this critical time in our nation's history, HCA Healthcare and Galen College of Nursing are leading the way in nursing workforce development. Galen is proud to offer best-in-class programs for colleagues across the country interested in becoming nurses, as well as current nurses looking to advance their careers. Together, we can advance the future of nursing!"

Galen's website also offers training for existing nurses in HCA facilities, which it refers to as "HCA Employees." It's plausible that Mission nurses would be included in this group.



The Galen website states:

"As part of the HCA Healthcare family, Galen offers graduates unique access to a wide range of employment opportunities, nursing development and education to existing HCA Healthcare nurses, to enjoy a career of a lifetime."

When a person clicks on the "HCA Employees" link, this is what they see:



Galen/HCA offers its training services to nurses in North Carolina and that work at Mission. The Galen arrangement is not the work of a passive equity partner. To the contrary, this is the work of an entity that seeks an extremely elevated level of control over many citizens of Western North Carolina.

HCA actively collects debt from Western North Carolinians through its subsidiary, NPAS Solutions which is based in Louisville, KY. In their SEC filings, they refer to the entity as National Patient Account Services, Inc., NPAS Solutions LLC, and NPAS, Inc. NPAS Solutions is a debt collector. NPAS Solutions frequently calls citizens of Western North Carolina. If a North Carolina patient is short on money for their medical bills at Mission, they are likely to hear from NPAS and NPAS is controlled by HCA. Yet again, this is not the work of a passive equity investor. HCA is not

passive; they are actively engaged in North Carolina in many different ways. This is

additional prima facie evidence that personal jurisdiction is appropriate.

Mission's website www.missionhealth.org is copywritten by HCA. Copyrighting

is a federal process that involves controlling content. Copyrighting a website is not the

work of a passive equity investor.

<div style="border:1px solid black;">

**✛ MISSION HEALTH**

Copyright 1999-2026 C-HCA, Inc.; All rights reserved.

</div>

C-HCA Inc. is an entity that HCA uses to hold intellectual property. Mission

facilities serve somewhere around 1,000,000 North Carolinians, and its website is

accessible to that same group of North Carolinians. HCA holds itself out as the

responsible party for the content of the website – it is a public-facing assertion of control.

Again, not the work of a passive equity investor. This is additional prima facie evidence

that personal jurisdiction is appropriate.

HCA also controls the delivery of medical records. Plaintiff has at times

requested medical records and billing statements through the Mission website (the same

website whose content is copywritten by HCA). When a Mission patient wants to access

their medical records online, one click takes them here:

<div style="border:1px solid black;">

**HCA✛**
Healthcare·

Request medical records from HCA
Healthcare



</div>

There is no mention of Mission. This process is controlled by HCA. If a patient prefers their records via US mail, HCA tells them to mail their request to this address: PO Box 290789, Nashville , TN 37229-0789. This is an HCA affiliated address. This is not the work of a passive equity investor. Everything runs through HCA. This is additional prima facie evidence that personal jurisdiction is appropriate.

The records request form can be found in Exhibit K. The form number is referred to as HCA-840-00434 and used as HCA's Authorization for Release of Protected Health Information which applies to Mission and other facilities. This is additional prima facie evidence that personal jurisdiction is appropriate.

Plaintiff has requested Itemized Billing Statements from HCA on three occasions in January and HCA has not sent them. Plaintiff alleges misconduct relating to the billing. HCA controls the billing, and they won't send the statements. HCA cannot be dismissed at this time. HCA appears to control access to the medical records and billing statements, which is more prima facie evidence of their involvement in North Carolina.

The Plaintiffs' allegations regarding medical record spoliation are already before the Court. There is a mystery addendum added to the medical record a few hours after Arrowood's misrepresentations to Plaintiff. An ER doctor named Zachary Foy accessed the ER medical records two weeks after Child was discharged. There is no credible way to understand which medications were missed and when. There are repeated contradictory statements between nursing staff and Deponti. Deponti contradicts himself from one day to the next. HCA is indisputably involved in the medical records in some capacity and for that reason, they must remain a defendant in this case. CMS states that Child's medical record is inaccurate – they are an authority on medical records.

Relating to the billing, Plaintiff was charged by Deponti for a 'greater than 30-minute discharge appointment.' Plaintiff attended the discharge, Deponti did not, and the discharge lasted about 3 minutes, but definitely not more than 6 minutes according to Mission's recorded medical record discharge time of 10:06am.

Because HCA is an equity holder in Mission (per the Bray declaration), they may have in fact already received Plaintiff's money, and they already received money from Plaintiff's insurance company Blue Cross Blue Shield. As the equity owner of Mission, HCA benefits from and participates in the revenue generated by Mission's billing activities. Accordingly, to the extent Plaintiff or Plaintiff's insurer paid charges arising from the disputed discharge billing, HCA plausibly received or realized the benefit of those funds through its ownership interest in the Mission enterprise. As a result, HCA must remain as a defendant. HCA is simply seeking to keep as much money as possible, while deferring as much liability as possible. Every dollar of liability they avoid is necessarily another dollar in their pocket.

At this stage, Plaintiff bears only a prima facie burden. Factual conflicts must be resolved in Plaintiff's favor. HCA's Rule 12(b)(2) motion asks the Court to disregard extensive, objective evidence of HCA's direct and continuous involvement in Mission Hospital and in North Carolina. Instead, HCA wants the Court to accept a set of abstract corporate disclaimers from an accountant. This does not align with practical realities in the record.

HCA asserts that it is a passive, non-operating holding company with no purposeful contact with North Carolina, yet the same record shows that Mission executives and individual defendants communicated exclusively through HCA

Healthcare corporate email systems, that Mission employees were governed by a mandatory HCA Code of Conduct re-acknowledged annually by thousands of North Carolina residents, and that system-wide directives addressing patient safety, compliance, retaliation, and regulatory crises were issued through HCA-controlled channels. It is difficult to reconcile HCA's claim of non-involvement with its undisputed role in prescribing how Mission personnel must act, communicate, document, and respond to regulatory events inside this forum.

Plaintiff asserts that each of its claims "arise out of" HCA's contacts with North Carolina. Each of the 10,000 or more employees at Mission are controlled by the HCA Code of Conduct. CEO Greg Lowe authored employee communication with HCA within the last 7 days. At every step of the billing and medical records, you don't see Mission, you see HCA.

The Bray declaration does not resolve these contradictions. Bray does not appear to have any background in operations, compliance, human resources or patient safety. Bray has been a licensed CPA since 1985 according to the Tennessee State Board of Accountancy. Plaintiff questions whether it is possible for any individual, let alone a career accountant, to comprehensively understand every potential nuance in the relationship between HCA and Mission.

Bray's declaration appears to ignore the HCA Healthcare Code of Conduct. Bray signed a declaration that states:

> "My duties include overseeing accounting practices and preparation of reports filed with the Securities and Exchange Commission for HCA Healthcare, Inc. and its affiliated entities."

HCA's most recent 10-k annual SEC filing, which is for calendar year 2024 (Exhibit L) states the following:

> "We have a Code of Conduct which is applicable to all our directors, officers and employees (the "Code of Conduct")."

This Code of Conduct impacts over 10,000 workers in North Carolina, HCA characterizes the Code as "mandatory," Bray had to know about the Code given his involvement with the SEC filings (and the fact as an HCA employee he would have signed the Code and continue to do so every year), but he continues that HCA "did not operate, conduct, or carry on any business in North Carolina." It doesn't make any sense.

It's challenging to reconcile Bray's statements against the realities of the importance of the Code of Conduct, both to Bray's employer and the 10,000+ North Carolina residents that are forced to sign it. Moreover, within one day of the Bray declaration, Mission CEO Greg Lowe sends out the Fourth Immediate Jeopardy employee notice, ostensibly to every Mission employee, with the HCA and Mission logos side-by-side.

The declaration offers broad legal conclusions about non-operation and lack of control while omitting any engagement with the very mechanisms through which HCA exerts influence – those include corporate compliance mandates, violation reporting standards, centralized communications infrastructure, educating and training future nurses via Galen, control over medical records and billing, debt collections, and uniform governance documents binding thousands of North Carolina employees.

HCA's response states that "HCA Healthcare, Inc had no involvement in the Hospital's operation." Given the preponderance of prima facie evidence to suggest otherwise, their argument just doesn't work. HCA must stay in this case.

In *Mylan Laboratories, Inc. v. Akzo, N.V.,* 2 F.3d 56 (1993), the Fourt Circuit referenced a 'corporate veil piercing' test which "allows a court to attribute the actions of a subsidiary corporation to the foreign parent corporation only if the parent exerts considerable control over the activities of the subsidiary" The court emphasized that "central to the exertion of such control, and thus to whether the corporate veil may be pierced, is whether significant decisions of the subsidiary must be approved by the parent." In Plaintiff's case, HCA (parent) exercises enormous control over Mission (subsidiary) based on available prima facie evidence such as the Code of Conduct. HCA controls every single North Carolinian employee at their facilities. The Code of Conduct is not published by Mission – it is published by HCA and does not appear to subject to Mission's input, evaluation or negotiation, for it applies to every hospital and every worker in the HCA portfolio and it is mandatory. Plaintiff is not asking the Court to pierce the veil at this point but rather simply recognize the extreme level of control that HCA has over Mission and therefore over the matters at hand in this litigation.

When courts address jurisdictional conflicts "on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge." Combs v. Bakker, 886 F.2d 673 (1989). The quantity of prima facie evidence is so robust that HCA's assertion that it doesn't have involvement in Mission simply cannot be true.

At minimum, this record presents disputed jurisdictional facts that cannot be resolved in HCA's favor on a Rule 12(b)(2) motion. Accepting HCA's position would require the Court to treat extensive documentary evidence of forum-directed conduct as legally irrelevant, which the prima facie standard does not permit.

Plaintiff is pro se.

This the 4th day of February, 2026.

Respectfully submitted,

_____

Bill Madson

Pro Se Plaintiff